UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ARUTYUN DEMIRCHYAN, | ) | CV 08-3452 SVW (MANx) |
| Petitioner, | ) | |
| | ) | |
| v. | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| ALBERTO R. GONZALES, Attorney | ) | |
| General, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## I.   BACKGROUND

This action comes to the Court by way of 8 U.S.C. § 1252(b)(5),

which requires the action to be treated as an action for declaratory

relief under 28 U.S.C. § 2201.  The Ninth Circuit, in reviewing

Petitioner's appeal from a decision by an immigration law judge,

transferred the case to this Court to conduct a *de novo* hearing on

Petitioner's assertion that he is a United States citizen.  The Ninth

Circuit's Order states in relevant part:

> We nonetheless retain jurisdiction to determine Demirchyan's claim
> of citizenship. 8 U.S.C. § 1252(b)(5). Because we find that the
> government's documentary evidence "would be refuted by the
> testimony of petitioner's witnesses if that testimony were
> accepted by the trier of fact, there is plainly a genuine issue of
> material fact . . . on the question of petitioner's citizenship."

*Agosto v. INS*, 436 U.S. 748, 761, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) (internal citation omitted). We must therefore transfer the case to the district court for a de novo review of Demirchyan's citizenship claim. 8 U.S.C. § 1252(b)(5)(B); *Agosto*, 436 U.S. at 756-57, 98 S.Ct. 2081.

See <u>Demirchyan v. Mukasey</u>, 278 Fed. Appx. 778, 779 (9th Cir. 2008).

Pursuant to the Ninth Circuit's order, the Court held evidentiary hearings on August 25, 2009 and June 16, 2010.  The crux of the dispute is that the Government contends that Petitioner was born in 1976, and Petitioner contends that he was born in 1977.  If Petitioner was born in 1977, then he is entitled to derivative United States citizenship because he was under the age of 18 when his mother became a United States citizen.  If Petitioner was born in 1976, then he is precluded from obtaining derivative United States citizenship because he was over the age of 18 when his mother became a United States citizen.  <u>See</u> 8 U.S.C. § 1432(a) (West 1994), *repealed by* Child Citizenship Act of 2000, § 103, Pub. L. No. 106-395, 114 Stat. 1631.[1]

Having reviewed the parties' evidentiary submissions and legal memoranda, the Court makes the following findings of fact and reaches

---

[1] At the relevant time period, the operative statute provided:
> A child born outside of the United States of alien parents, or of an alien parent and a citizen parent who has subsequently lost citizenship of the United States, becomes a citizen of the United States upon fulfillment of the following conditions:
> . . .
> (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents . . . ; and if
> (4) **Such naturalization takes place while such child is under the age of eighteen years**; and
> (5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of . . . the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a) (West 1994) (emphasis added).

the following conclusions of law.[2]


## II.   LEGAL STANDARDS REGARDING ADMISSIBLE EVIDENCE

The parties' dispute is factual, not legal.  Accordingly, the Court must carefully distinguish between admissible evidence and inadmissible evidence.  Only after isolating the admissible evidence may the Court engage in credibility determinations and act as a fact-finder by weighing the parties' evidence.

### A.   AUTHENTICATION

The parties offer various documents that purport to contain official records.  These documents include a diplomatic note from the Armenian government; records from Armenian schools and medical offices; Armenian government records; and United States government records.

The authentication requirement is most easily satisfied if the document meets the various statutory criteria for self-authentication. See Fed. R. Evid. 902.  However, self-authentication is not the only method of authenticating documents, and it is legal error for a court to refuse to consider a party's documents solely because they fail to satisfy the self-authentication requirements.[3]  Any documentary evidence may be authenticated through extrinsic evidence "sufficient to support

---

[2] The Court notes at the outset that the Order is heavily weighted toward factual findings, and most of the Court's legal analysis is included in the "Findings of Fact" section.  The central legal questions presented involve evidentiary questions rather than questions of substantive immigration law.  In order to present a more coherent analysis, the Court includes its evidentiary legal conclusions as part of "Findings of Fact" section.

[3] The Ninth Circuit formerly "require[d] strict compliance with the authenticity rules," United States v. Perlmuter, 693 F.2d 1290, 1292 (9th Cir. 1982), but appears to have retreated from this rule, as shown by the cases discussed infra.

3

a finding that the matter in question is what its proponent claims."
Fed. R. Evid. 901(a).

The Ninth Circuit has issued two decisions that have a direct
bearing on the present case.  In the first case, the court held that a
*prima facie* showing of authentication may be made by the immigration
petitioner; in the second case, the court held that a *prima facie*
showing may be made by a United States consul who attests to the
authentication of a foreign government's diplomatic note.

In <u>Vatyan v. Mukasey</u>, 508 F.3d 1179 (9th Cir. 2007), the Ninth
Circuit held that it was legal error for an immigration judge to
exclude documentary evidence that the immigration petitioner sought to
authenticate by way of his own testimony.  The immigration judge had
concluded that the petitioner's documents were inadmissible solely
because they were not accompanied by official forms of authentication.
<u>Id.</u> at 1182 n.1.  The Ninth Circuit explained that immigration judges
must admit any evidence that satisfies the requirements of either the
Federal Rules of Evidence or the relevant immigration regulations, 8
C.F.R. § 287.6.[4]  Notably, the court explained:

> if the party offering the evidence is unable to self-authenticate
> it pursuant to Federal Rule of Evidence Rule 902, the party is not
> precluded from attempting to authenticate it under the general
> provision of Rule 901 that "[t]he requirement of authentication or
> identification as a condition precedent to admissibility is
> satisfied by evidence sufficient to support a finding that the

---

[4] Note that, in the present case, the Government relies in part on 8
C.F.R. § 287.6(b).  This reliance is misplaced because the regulation
only applies in administrative proceedings conducted by an
immigration judge.

Although the present case originated as an administrative
proceeding, the Ninth Circuit transferred the case to this Court
because Demirchyan claimed to be a United States national — a matter
that is to be determined by the federal courts *de novo*, 8 U.S.C. §
1252(a)(5), not by an immigration judge.

1    matter in question is what its proponent claims."

2    Id. at 1184.  The court approvingly cited cases in which Canadian

3    public documents were authenticated by an Alberta DMV employee, id.

4    (citing United States v. Childs, 5 F.3d 1328, 1336 (9th Cir. 1993)),

5    and German immigration papers were authenticated by a United States

6    "INS officer's testimony regarding their source and their appearance."

7    Id. (citing Yongo v. INS, 355 F.3d 27, 31 (1st Cir. 2004)).

8        Applying these rules to the case before it, the Ninth Circuit

9    explained that, on remand, the immigration judge must consider the

10   petitioner's testimony that certain Armenian documents were official.

11   The petitioner wished to testify that, as a "longtime resident of

12   Armenia . . . he recognized the official stamps on the documents as the

13   stamps of the Armenian government."  Id. at 1184.  In addition, he

14   would testify so as "to establish a chain of custody by explaining how

15   the documents came into his possession."  Id.  The court pointed

16   out that the immigration judge was not **required** under Fed. R. Evid. 901

17   to accept this testimony as true, but rather, the immigration judge

18   must "assess the credibility of that testimony and determine whether

19   the balance of the evidence is sufficiently compelling to satisfy him

20   that the documents are what Vatyan claims them to be."  Id. at 1185.

21   The court noted, however, that it would be legal error "to find the

22   petitioner not credible simply because he does not produce an certified

23   copy."  Id. at 1185 n.5.

24       In United States v. Iribe, 564 F.3d 1155, 1159 (9th Cir. 2009),

25   the Ninth Circuit held that a diplomatic note from Mexico was

26   sufficiently authenticated where it was accompanied by a declaration

27   from a United States State Department official stating that the

28

"Department of State considers Diplomatic Note No. 46341 to be an official communication of the Government of Mexico." <u>Id.</u>  The court held that the State Department official's "declaration, made under penalty of perjury and based on personal knowledge and on information obtained in the performance of official duties, suffices to establish a prima facie case of the authenticity of the Diplomatic Note.  No contrary evidence appears in the record."  <u>Id.</u>

With respect to self-authentication by foreign government officials, the <u>Business and Commercial Litigation in Federal Courts</u> treatise contains a useful summary of the relevant requirements.  <u>See</u> 2 Robert L. Haig, <u>Bus. and Comm. Litig.</u>, § 18:106 (2d ed. 2005).  The author explains that foreign official records may be self-authenticated in one of five ways (with the potentially relevant rules for this case in **bold**): (1) an official copy of a record "that purports to have been printed by authority of the foreign government"; (2) **a copy that is attested to by a person authorized to make the attestation and is accompanied by a certification as to the genuineness of the signature and official position of the attesting person"; such "attesting person" may include a United States diplomatic official**; (3) the record may be accompanied by a chain of certifications in which a high-level foreign official attests to the authority of the lower-level foreign officials who created the document, and a United States diplomatic official attests to the authority of the high-level foreign official; (4) **under the Hague Public Documents Convention, the foreign document is accompanied by a "model apostille" that "certifies the signature, official position, and seal of the attesting officer"**; and (5) "**where reasonable opportunity has been given for the parties to investigate a**

**record's authenticity and accuracy, the record may be authenticated by submitting an attested copy without final certification or an attested summary of the record upon a showing of good cause.**" <u>Id.</u> (emphasis added).   The applicable statutory text is set out in the footnote.[5]

---

[5] Under Fed. R. Evid. 902(3), a foreign public document is authenticated if the following is satisfied:

> A document purporting to be executed or attested in an official capacity by a person authorized by the laws of a foreign country to make the execution or attestation, and **accompanied by a final certification as to the genuineness of the signature and official position** (A) of the executing or attesting person, or (B) of any foreign official whose certificate of genuineness of signature and official position relates to the execution or attestation or is in a chain of certificates of genuineness of signature and official position relating to the execution or attestation. A final certification may be made by a secretary of an embassy or legation, consul general, consul, vice consul, or consular agent of the United States, or a diplomatic or consular official of the foreign country assigned or accredited to the United States. If reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of official documents, the court may, **for good cause shown**, order that they be treated as presumptively authentic without final certification or permit them to be evidenced by an attested summary with or without final certification.

Fed. R. Evid. 902(3) (emphasis added).

The Government also relies upon a materially identical provision in the Federal Rules of Civil Procedure, Fed. R. Civ. P. 44(a)(2). <u>See</u> Mueller & Kirkpatrick, <u>Federal Evidence</u>, § 9:32 (3d ed. 2010 supp.) ("Fed. R. Evid. 902(3) is almost a verbatim replication of Fed. R. Civ. P. 44(a)(2)."); <u>accord</u> Jack B. Weinstein & Margaret A. Berger, 5 <u>Weinstein's Federal Evidence</u>, § 902.05[3] (("Rule 902(3), however, is broader than Federal Rule 44(a)(2). Rule 902 makes the certification process applicable to any 'document' purporting to be executed or attested to by a person authorized by the laws of a foreign country, whereas the civil procedure rule is limited to a 'foreign official record.'").

The Federal Rules of Civil Procedure provide:

> (A) In General. Each of the following evidences a foreign official record--or an entry in it--that is otherwise admissible:
>
> (i) an official publication of the record; or
> (ii) the record--or a copy--that is attested by an authorized person and is accompanied either by a **final certification of genuineness** or by a certification under a treaty or convention to which the United States and the country

**B.   HEARSAY**

Hearsay and authentication are separate and independent requirements for evidentiary admissibility.[6]  As noted by the Second Circuit, "[t]o satisfy [the rules of authentication,] the [government] official does not need to attest to the truth or trustworthiness of the facts contained in the document; accuracy of its content is the concern of other Federal Rules, such as the many rules concerning hearsay in Rules 801, *et seq*. The only concern of Rules 901, *et seq*. is assuring that evidence is what it purports to be."  United States v. Doyle, 130

where the record is located are parties.
(B) Final Certification of Genuineness. A final certification must certify the genuineness of the signature and official position of the attester or of any foreign official whose certificate of genuineness relates to the attestation or is in a chain of certificates of genuineness relating to the attestation. A final certification may be made by a secretary of a United States embassy or legation; by a consul general, vice consul, or consular agent of the United States; or by a diplomatic or consular official of the foreign country assigned or accredited to the United States.
(C) Other Means of Proof. If all parties have had a reasonable opportunity to investigate a foreign record's authenticity and accuracy, the court may, **for good cause**, either:
       (i) admit an attested copy without final certification; or
       (ii) permit the record to be evidenced by an attested summary with or without a final certification.
Fed. R. Civ. P. 44(a)(2) (emphasis added).

[6] In the present case, the Government makes explicit hearsay objections to Petitioner's evidence.  (See Joint Exhibit List.)  Petitioner likewise appears to make hearsay-related objections to the Government's evidence.  Specifically, Petitioner concedes that the Government's documents are authentic, but appears to make a hearsay objection by arguing that the Court should afford less weight to the Government's documents and should be wary of allowing the United States government and Armenian government to reach a diplomatic agreement regarding historical facts of Petitioner's birth.  (Pet.'s Resp. at 3-4.)  Petitioner appears to be arguing that the Government's evidence lacks reliability and credibility and that because the authors of the documents are unavailable to testify, the Court cannot trust their factual assertions.  The Court accordingly treats these arguments as hearsay objections.

F.3d 523, 545 (2d Cir. 1997).

The Second Circuit in Doyle applied the often-narrow distinction between authentication and hearsay.  The evidentiary objection involved various private business documents that had been filed with the Maltese government.  Doyle, 130 F.3d at 544-45.  The court explained that the documents had been adequately **authenticated** by a Maltese customs department official because the documents had been filed with the Maltese government.  Id. at 545.  On the other hand, the court held that the documents were inadmissible **hearsay** because there was no evidence either of (1) the private businesses' practices of generating the documents (as would be required under the Fed. R. Evid. 803(6) "records of regularly conducted activity" hearsay exception), or (2) whether the Maltese government took efforts to assure the truthfulness of the documents filed with it (as would be required under the Fed. R. Evid. 803(8) "public records and reports" hearsay exception).  Id. at 547.

With respect to the "residual" hearsay exception of Fed. R. Evid. 807 (upon which the Government also relies), the Ninth Circuit recently summarized its caselaw regarding this type of evidence.  See United States v. Bonds, 608 F.3d 495, 500-01 (9th Cir. 2010).  The rule only applies in "exceptional circumstances."  Id. (quotations omitted).  The court noted that district courts have "wide discretion in the application of FRE 807, whether it be to admit or exclude evidence," and that only one appellate case has reversed a district court's decision under Fed. R. Evid. 807.  Id.  The court explained that in that one reversal, the district court excluded statements that had strong indicators of trustworthiness because they "were videotaped and

under oath," and the circumstances were exceptional because the witness had been deported from the country.  Id. (citing United States v. Sanchez-Lima, 161 F.3d 545, 547-48 (9th Cir. 1998)).  But in the context of the case before it, the court emphasized that the central inquiry involves "the record of untrustworthiness of the out of court declarant."  Id. at 502.

## III. APPLICATION OF EVIDENTIARY RULES

### A.   Diplomatic Note from the Armenian Government

The Government's central piece of evidence is a diplomatic note received from the Armenian government.  If admitted and credited, this evidence would establish that, according to the official records of the Armenia government, Petitioner was born in 1976.  Such evidence would be at least strongly persuasive, if not completely dispositive.

Following the evidentiary hearing in August 2009, the Ministry of Foreign Affairs of the Republic of Armenia provided a diplomatic note[7] that (1) purports to authenticate a birth certificate containing a 1976 birth date, and (2) asserts that Petitioner's documents containing a

---

[7] "Diplomatic Notes are used for correspondence between the State Department and foreign governments."  United States v. Al-Hamdi, 356 F.3d 564, 569 n.5 (4th Cir. 2004).

A search of the caselaw reveals that diplomatic notes are used almost exclusively for purposes of obtaining extradition, for governments to express their official legal or political positions on certain issues, and for governments to reach informal diplomatic agreements.

There is only one readily available authority in which a diplomatic note was used to present evidentiary facts.  In that case, United States v. Colby, 25 C.M.R. 727 (N.B.R. 1958), the Navy Board of Review held that the diplomatic notes at issue were inadequately authenticated under the applicable Manual for Court-Martial.  The court noted that the diplomatic notes were inadequately authenticated because they were not issued under seal or signed by the applicable foreign official.  Id. at 732.

1977 birth date are not authentic.  The diplomatic note states in relevant part: "The Ministry of Foreign Affairs of the Republic of Armenia . . . [,] as a response to the diplomatic note # 355/09A from 20th of August, 2009 has the honor to inform, that the records of the birth certificate copies with serial numbers AA004157 and AA171351 that were sent by the [United States] Embassy, are not authentic to the real records.  Meanwhile the ministry has the honor to inform, that the records of the attached birth certificate translation with the notary's certification is authentic to the real records.  Harutyun Tigrani Demirchyan was born on 27th of July, 1976, in Yerevan city." (Ex. 40.)

The diplomatic note from the Armenian Ministry of Foreign Affairs is purportedly authenticated by a letter from Robert N. Farquhar, Jr., Consul to the American Embassy at Yerevan, Armenia.  (Ex. 40.) Farquhar's September 17, 2009 letter states: "I certify that the enclosed documents consist of the official communication from the Government of Armenia received via diplomatic channels and translated by Consular Section personnel."  This letter is accompanied by a certification from the United States Secretary of State stating that "Robert N. Farquhar, Jr., whose name is subscribed to the document hereunto annexed, was at the time of subscribing the same Consul of the United States of American, at Yerevan, Armenia duly commissioned." This certification is accompanied by an official seal and the signature of Assistant Authentication Officer Joan C. Hampton on behalf of the United States Secretary of State.

### 1. Authentication

#### a. The diplomatic note is not self-authenticating

The Government asserts that the Armenian diplomatic note is self-

authenticating and/or is authenticated by way of the authenticated Robert Farquhar letter of September 17, 2009 stating that he received the Armenian diplomatic note.  The Government argues that this evidence is self-authenticating as a foreign government record because it was received by the United States Consul in Armenia through official diplomatic channels.

The diplomatic note, combined with the Farquhar letter attesting to the note's origins, is not a self-authenticating document.  The note and letter do not satisfy the specific requirements of either Fed. R. Evid. 902(3) ("Foreign public documents") or Fed. R. Civ. P. 44(a)(2) ("Proving an Official Record: Foreign Record").  The Farquhar letter is not an adequate "final certification as to the genuineness of the signature and official position" of the person who either executed the document or authenticated it.  Fed. R. Evid. 902(3); see United States v. Leal, 509 F.2d 122, 126 (9th Cir. 1975) ("The rule [Fed. R. Civ. P. 44(a)(2)] requires . . . that . . . a[n attested] copy be accompanied by a final certification as to the genuineness of the signature and official position of the attesting person."); United States v. Perlmuter, 693 F.2d 1290, 1293 (9th Cir. 1982) ("The trial court was correct in its determination that the first requirement of 902(3) was not met; that requirement is that the document be executed or attested by a person who is acting in an official capacity and *who is authorized by the laws of that country to make the attestation or execution*.").  Farquhar fails to state, as is required under those Rules, that the Armenian official who executed the diplomatic note had legal authority to execute the note on behalf of the Armenian government.

Nor is the Armenian diplomatic note subject to the residual

1  authentication standard that allows the Court, "for good cause shown,"
2  to dispense with the formal requirements of "final certification" by an
3  appropriate government official.  Fed. R. Evid. 902(3).  The Government
4  bears the burden of showing "good cause" for its failure to obtain the
5  proper official certification.  United States v. Yousef, 175 F.R.D.
6  192, 194 (S.D.N.Y. 1997); see also United States v. De Jongh, 937 F.2d
7  1, 4 (1st Cir. 1991) (" The burden of showing good cause, of course,
8  rests with the proponent of the document."); United States v.
9  Perlmuter, 693 F.2d 1290, 1293 n.2 (9th Cir. 1982).  The Government has
10  not met its burden of showing good cause for its failure to obtain
11  proper certification.  Indeed, the Government has not even attempted to
12  show good cause.  Cf. Leal, 509 F.2d at 126 (government showed "good
13  cause" where it requested that the foreign official appear at the
14  United States embassy in order to execute final certification, but
15  foreign official refused to appear and "there was no way that [the
16  United States government] could compel him to do so"; instead, when
17  foreign official refused to comply with any procedures other than those
18  of his own government, United States officials obtained the documents
19  "in accordance with those procedures").

20          **b.   The note may be authenticated by extrinsic evidence**
21       The Government attempts to authenticate the Armenian diplomatic
22  note by way of the September 17 letter of Robert Farquhar, a United
23  States Consul in Armenia.  Farquhar writes that he "certif[ies] that
24  the enclosed documents consist of the official communication from the
25  Government of Armenia received via diplomatic channels and translated
26  by Consular Section personnel."  (Farquhar Sept. 17, 2009 letter.)
27       Under the Ninth Circuit authority Iribe, Farquhar's letter — **if it**
28

13

**is admissible** — contains sufficient facts to show that the Armenian diplomatic note is authentic.  In <u>Iribe</u>, the government satisfied its evidentiary burden by including a declaration from a United States State Department official stating that a foreign diplomatic note was an "official communication" of the government that issued the note.  <u>Iribe</u>, 564 F.3d at 1159.  The Ninth Circuit held that this declaration sufficiently established authenticity because it was "based on personal knowledge and on information obtained in the performance of official duties," and "[n]o contrary evidence" was introduced.  <u>Id.</u>  Here, Farquhar's letter operates in exactly the same manner, and contains materially similar factual assertions, as the state department official's declaration in <u>Iribe</u>.  <u>Accord</u> <u>Barthelemy v. Air Lines Pilots Ass'n</u>, 897 F.2d 999, 1018 (9th Cir. 1990) (holding that "personal knowledge and competence to testify . . . may be inferred from the affidavits themselves" and that personal knowledge may be "reasonably inferred from [the affiants'] positions and the nature of their participation in the matters to which they swore").

The present case, however, involves an extra link in the evidentiary chain that was not at issue in <u>Iribe</u>.  In <u>Iribe</u>, the government provided a **sworn declaration** from the United States State Department official who authenticated the foreign government's diplomatic note.  Here, however, the government has provided an **unsworn letter** from Farquhar.  In order for the contents of this letter to be admitted into evidence, the Court must ensure that Farquhar's unsworn letter is itself admissible.

Farquhar's September 17 letter is purportedly authenticated by way of a State Department official certification that Farquhar's September

17 letter is authentic and that Farquhar is in fact the United States consul in Yerevan, Armenia.  Under Fed. R. Evid. 902(2), a domestic public document such as Farquhar's September 17 letter is self-authenticating when it is accompanied by a certification under government seal such as the State Department certification of September 30.  Fed. R. Evid. 902(2) treats as self-authenticating "[a] document purporting to bear the signature in the official capacity of an officer or employee of any [government] entity . . . having no seal, if a public officer having a seal and having official duties in the district or political subdivision of the officer or employee certifies under seal that the signer has the official capacity and that the signature is genuine."

    Treatise-writers Mueller and Kirkpatrick helpfully break this rule down into four distinct requirements: (1) "the public entity from which the document came have no seal" (but, at the same time, "[t]he court should assume that no seal is available if the proponent goes to the trouble of authenticating the document under Fed. R. Evid. 902(2) rather than Fed. R. Evid. 902(1) by obtaining the certificate and seal of a third person"); (2) there must be "a signed-and-sealed certificate by a public officer having official duties in the same [government agency] from which comes the document in question"; (3) the "certificate [must] affirm that the signer of the public document had the 'official capacity'"; and (4) "the certificate must state that the signature on the document is genuine."  Christopher B. Mueller and Laird C. Kirkpatrick, 5 <u>Federal Evidence</u>, § 9:31 (3d ed. 2010 supp.); <u>see also</u> C.A. Wright & V.J. Gold, 31 <u>Federal Practice and Procedure</u>, § 1736 (1st ed. 2010 supp.) (same).

A good illustration of Rule 902(2) can be found in <u>United States</u> <u>v. Combs</u>, 762 F.2d 1343 (9th Cir. 1985).  In that case, the government relied on a report stating that the defendant was not registered to possess a firearm.  The report was not under seal (which would have satisfied Rule 902(1) self-authentication for "public records under seal"), but instead was accompanied by a certification document that itself was under seal.  The certification document was signed by the Chief of the National Firearms Branch of the Bureau of Alcohol, Tobacco, and Firearms, and it stated that the author of the report was familiar with the relevant firearm registration records and that the report's signature appeared to be true.  <u>Id.</u> at 1348.

In the present case, the State Department's September 30 certification operates in the same manner as the certification at issue in <u>Combs</u>.  An Assistant Authentication Officer from the State Department, acting on behalf of Secretary of State Hillary Clinton, certified that Robert Farquhar was the "duly commissioned" consul in Armenia at the time he "subscribed" to the September 17 letter, and that his "name is subscribed" to that letter.  Accordingly, the State Department's September 30 certification establishes that Farquhar's September 17 letter is self-authenticating pursuant to Fed. R. Evid. 902(2).  Farquhar's September 17 letter contains sufficient facts (if admissible under a hearsay exception) to show that, like the Mexican diplomatic note at issue in <u>Iribe</u>, the Armenian diplomatic note is authentic.

### 2.  Hearsay

#### a.  Relevant hearsay rules

The hearsay rules present obstacles to the admission of both

Armenian diplomatic note and the Farquhar September 17 letter (which is essential to the authentication of diplomatic note).

Here, "[t]he government's exhibits fall within the classic definition of hearsay, for they contain information as to which '[t]he declarant is not present and thus cannot be cross-examined.'" <u>United States v. Chu Kong Yin</u>, 935 F.2d 990, 996 (9th Cir. 1991) (quoting <u>NLRB v. First Termite Control Co.</u>, 646 F.2d 424, 426 (9th Cir. 1981)). Neither Farquhar nor the Armenian government official who prepared the diplomatic note were made available to testify in court.[8]

The Government argues that its evidence satisfies the "public records" hearsay exception, Fed. R. Evid. 803(8), and/or the "residual" hearsay exception, Fed. R. Evid. 807 (formerly 803(24)).  The public records exception provides for the admissibility of:

> [r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8).

It should be noted that Fed. R. Evid. 803(8) applies both to domestic government bodies and foreign government bodies.  <u>See, e.g.</u>, <u>United States v. Grady</u>, 544 F.2d 598, 604 (2d Cir. 1976) (holding that Irish police records were admissible under Fed. R. Evid. 803(8)).

---

[8] The Government's trial brief stated that the Government "will seek to introduce the [diplomatic note] in lieu of video testimony from Farquhar." (Trial Brief at 4.)  The Government later abandoned this effort.

This hearsay rule was applied in <u>United States v. Perlmuter</u>, 693 F.2d 1290 (9th Cir. 1982), to exclude evidence of the defendant's prior criminal history provided by the Israeli National Police.   The court held that the Israeli criminal history report failed to satisfy the public records hearsay exception "[b]ecause there is no indication that Herstig, the person who signed the conviction report . . . had first hand knowledge of the convictions"; accordingly the evidence failed to satisfy subpart (A) of Rule 803(8).  <u>Id.</u> at 1293.  The court also noted that "there is no evidence of any duty on the part of Herstig or anyone else to record this information.  It may have been prepared just for the [United States government's] request and not as part of any duty to record day to day.  This is another factor preventing us from finding the 803(8) exception helpful to the Government here."  <u>Id.</u> at 1294 (internal citation and footnote omitted).  Finally, the court rejected the government's attempt to rely on the residual hearsay exception because "[t]here is nothing indicating that [the conviction history report], when compared with other hearsay exceptions, has 'equivalent circumstantial guarantees of trustworthiness.'  In addition, there is nothing in the record to indicate that through reasonable efforts the government could not procure more probative evidence such as the actual judgments of conviction."  <u>Id.</u> (quoting Fed. R. Evid. 803(24), now codified at Fed. R. Evid. 807).

The exact same reasoning from <u>Perlmuter</u> was applied to exclude properly-authenticated criminal records from Hong Kong in <u>Chu Kong Yin</u>, 935 F.2d at 995, 999.  In addition to adopting <u>Perlmuter</u>'s reasoning, the <u>Chu Kong Yin</u> court also added that the residual hearsay exception would not apply where "the record does not reveal the identity of the

declarants of the various hearsay statements in the government's exhibits, nor does it demonstrate that the government made the names and addresses of these declarants available to [defendant] in advance of trial" as is required in this circuit.  Id. at 1000.

More recently, in United States v. Pintado-Isiordia, 448 F.3d 1155 (9th Cir. 2006), the Ninth Circuit held that, although a Mexican birth certificate was automatically **authenticated** by way of a Hague Convention apostille, the document failed to satisfy the requirements of the public records hearsay exception because there was no evidence that the birth certificate "was a record of matters 'observed pursuant to duty imposed by law.'" Id. at 1157 (quoting Fed. R. Evid. 803(8)). The court noted that the document **would** have satisfied this hearsay exception but for the fact that "[t]he portion of the document that purports to set forth the legal authority for maintaining the record is shown as 'illegible' in the translated copy." Id.  Accordingly, there was no evidence to show that the document was "observed pursuant to duty imposed by law" and thereby satisfied the requirements of the hearsay exception.  Id.

In contrast, in Melridge, Inc. v. Heublein, 125 B.R. 825 (D. Or. 1991), the court admitted a Swiss police report under the public records exception because it was apparent from the face of the report that it contained "'factual findings resulting from an investigation' [that] are not excluded by the hearsay rule." Id. at 829 (quoting Fed. R. Evid. 803(8)(C)).  The report recounted Swiss police interviews that led the police to reach certain factual conclusions regarding the defendant's receipt of various cash payments.  Id. at 829-30.  The court held that this evidence provided a *prima facie* showing that the

report was conducted pursuant to a lawful government investigation, and the burden therefore rested on the opposing party to show that the document failed to satisfy the hearsay exception.  Id.  Absent such a showing by the opposing party, the court held that the police report was admissible.

The Government cites to a Seventh Circuit case, In the Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978, 954 F.2d 1279 (7th Cir. 1992), to argue that the Armenian diplomatic note satisfies the public records hearsay exception.  Even if that case were binding on this court,[9] it is factually distinguishable.  In that case, the plaintiffs introduced French government documents showing the costs incurred by the French governments in cleaning up after an oil spill. Id. at 1306-08.  The documents quite plainly satisfied subpart (A) of the public records exception because they recorded "the activities of the office or agency" in responding to the oil spill.  Id. at 1308 (quoting Fed. R. Evid. 803(8)(A)).  In addition, the record showed that the documents were "official expense records that the [government agency] maintained independently of the litigation."  Id.  As such, the documents loosely satisfied subpart (B), as they recorded "matters observed pursuant to duty imposed by law as to which matters there was a duty to report."  Id. (quoting Fed. R. Evid. 803(8)(B)).

### b. Discussion of public records hearsay exception

---

[9] The Amoco Cadiz case pointedly disagreed with Ninth Circuit authority that is binding on this Court.  See Amoco Cadiz, 954 F.2d at 1308 (disagreeing with Chu Kong Yin, 935 F.2d at 999).  It has even been suggested that certain aspects of the Amoco Cadiz decision misapplied the public records hearsay exception.  See Michael H. Graham, 4 Handbook of Fed. Evid., § 803:8, nn. 7, 9 (6th ed. 2009 supp.); Michael H. Graham, 30B Federal Practice & Procedure, § 7049 nn. 7, 9 (1st ed. 2010 supp.).

In light of the Ninth Circuit's clear caselaw, it is not sufficient for hearsay purposes simply for the Government to introduce a government document from the Armenian Foreign Ministry.  Rather, the Government must establish — either through some statement on the face of the Foreign Ministry document, or through extrinsic evidence — that the document sets forth (A) "the activities of the office or agency," (B) "matters observed pursuant to duty imposed by law," or (C) "factual findings resulting from an investigation made pursuant to authority granted by law."  Fed. R. Evid. 803(8).  There is no evidence in the record to show that the Armenian Foreign Ministry diplomatic note satisfies any of these requirements: the diplomatic note does not state facts regarding the Armenian foreign ministry's activities or conduct; it does not set forth that the facts were observed by the Armenian foreign ministry's agents or, even if it did, that such observations were done pursuant to a legal duty; and it does not set forth any facts from which it could be inferred that the Armenian foreign ministry conducted a factual investigation into the relevant matter, or, even if it did state such facts, that the investigation was conducted pursuant to the foreign ministry's legal authority to do so.  Rather, the diplomatic note contains a conclusory statement of fact, with no discussion whatsoever about the investigations that led the Armenian government to reach those conclusions.  Absent some threshold showing to satisfy one of the three alternatives set forth in Fed. R. Evid. 803(8), the Armenian diplomatic note is inadmissible hearsay.  See, e.g., Perlmuter, 693 F.2d at 1293-94; Chu Kong Yin, 935 F.2d at 999; Pintado-Isiordia, 448 F.3d at 1157.  Nor is there any evidence that the Armenian declarant had personal knowledge of the facts asserted in the

diplomatic note.  <u>See</u> Fed. R. Evid. 602; 5 <u>Weinstein's Federal</u> <u>Evidence</u>, § 803.10[4][a] ("Rule 602 provides that witnesses must have personal knowledge in order to testify.  For hearsay statements, the declarant is a witness, and the hearsay exceptions in Rule 803 do not dispense with the requirement of personal knowledge.  Thus, to be admissible under Rule 803(8), an investigative report must generally be based on the observations and knowledge of the person who prepared the report.") (citing <u>Perlmuter</u>, 693 F.2d at 1293-94; <u>Chu Kong Yin</u>, 935 F.2d at 999).

Likewise, the Farquhar September 17 letter fails to meet these same requirements of the public records hearsay exception.  Thus, the Farquhar letter is inadmissible hearsay and cannot provide a basis for authenticating the Armenian diplomatic note.

### c. Discussion of residual hearsay exception

With respect to the Government's argument that the diplomatic note should be admitted under the residual hearsay exception of Fed. R. Evid. 807, the Government has not established that the diplomatic note is "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts" or that the diplomatic note has "circumstantial guarantees of trustworthiness" that are "equivalent" to the guarantees of trustworthiness protected by the hearsay exceptions specifically enumerated in the Federal Rules.  Fed. R. Evid. 807.

As an initial matter, the Government's evidence fails to satisfy the procedural requirements of Fed. R. Evid. 807.  The Government's reliance on Fed. R. Evid. 807 flows directly from the fact that the Government has not made a reasonably thorough effort of collecting

admissible evidence.   The Government has not shown that more probative information — say, the actual birth certificate as recorded in the actual Armenian records offices — is not available through "reasonable efforts."   <u>See</u> Fed. R. Evid. 807.   Nor has the Government disclosed "the name and address of the declarant" whose factual assertion is contained in the diplomatic note.   <u>See</u> Fed. R. Evid. 807; <u>Chu Kong Yin</u>, 935 F.2d at 1000 (noting that proponent of the evidence must make such disclosures).

More importantly, the Government has not adequately shown that the diplomatic note contains "circumstantial guarantees of trustworthiness" that are similar to the protections afforded by the other hearsay exceptions.   Contrary to the Government's assertions, the Armenian diplomatic note is not an inherently trustworthy document.   A particularly useful discussion on this point can be found in <u>Balachova v. Mukasey</u>, 547 F.3d 374 (2d Cir. 2008).   In relevant part, the court held that the immigration judge should not have discredited the petitioner's testimony regarding his place of birth by relying on a Russian diplomatic note.[10]   In full, the court explained:

> The IJ [immigration judge] also noted that, according to a consular investigation, [the petitioner] Krasnoperov's birth certificate did not conform to Russian records, and that the copy furnished was not authenticated. The consular report on which the IJ relied states that
> On June 28, 1999 INS Moscow filed a diplomatic note # 099-044 with the Russian Ministry of Foreign affairs asking them to verify the information in the birth certificate, submitted by the respondent, with the appropriate Russian authorities (in this case, the Civil Registry Office of the city of Tyumen). On November 15, 1999 INS Moscow received a response from the Russian Ministry of Foreign Affairs. According to the

_____

[10] In that case, the Second Circuit held that an immigration judge's conclusions failed to satisfy the "substantial evidence" standard where the immigration judge made an improper finding that the petitioner lacked credibility.   <u>See</u> <u>id.</u> at 380-81.

> diplomatic note # K-568-99/1543, the information in the birth
> certificate submitted by the respondent does not comply with
> the official record certifying his birth.
> No further information concerning the investigation is given. We
> have . . . [previously] noted that the Department of Justice had
> issued guidelines for use in connection with consular
> investigative reports.  Those guidelines mandate that the report
> contain, "at a minimum," the name and title of the investigator,
> an indication of the investigator's fluency in the relevant
> language, an explanation of the competency of the investigator
> and/or translator, the specific objective of the investigation,
> the places where conversations or searches were conducted, the
> names and titles of people spoken to in the course of the
> investigation, the method used to verify the information, the
> circumstances, content, and results of each relevant conversation
> or search, and a statement that the investigator is aware of INS
> confidentiality provisions.
> . . . [T]he report in this case contains no information
> concerning the qualifications of the investigators, the identity
> of the Russian officials who prepared the response to the consular
> inquiry, or the methods, if any, used to verify the information
> supplied by the foreign official. Further, it is not even clear in
> what respects the birth certificate Krasnoperov offered varied
> from the original. We do not know whether there are major
> inconsistencies between the town's birth records and the
> certificate Krasnoperov furnished or merely minor technical
> inconsistencies. Under these circumstances, the consular report is
> unreliable and cannot contribute to [the immigration judge's]
> finding of substantial evidence.

Id. at 382-84 (internal citations omitted) (citing Lin v. U.S. Dept. of

Justice, 459 F.3d 255 (2d Cir. 2006)).  The court added that, "even if

the foreign official lacks a motive to fabricate, an insufficiently

detailed consular report does not constitute substantial evidence

[before the immigration judge] because its reliability cannot be

verified."  Id. at 383 n.7.

Although the Balachova court was addressing a different statutory

scheme and evidentiary rules, the court's discussion of foreign

consular reports is instructive.  The Armenian diplomatic note, like

the Russian diplomatic note at issue in Balachova, contains no factual

details that would reveal the quality and thoroughness of the Armenian

government's investigation into Petitioner's birth records.  Instead,

the Government is insisting that this Court take the Armenian government at its word without having an opportunity to test the Armenian declarant's credibility.  Such an approach is inappropriate.  The diplomatic note is not admissible under the residual hearsay exception.

### 3.    Summary re: Armenian Diplomatic Note

The Armenian diplomatic note is not self-authenticating under the relevant rules regarding foreign official documents.  The Armenian diplomatic note could be authenticated by the Farquhar September 17 letter, but that letter is inadmissible hearsay.

In addition to being unauthenticated, the Armenian diplomatic note is inadmissible hearsay.  Contrary to the Government's arguments, the diplomatic note does not satisfy the public records hearsay exception and the diplomatic note does not meet the requirements for invoking the residual hearsay exception.

Accordingly, the Armenian diplomatic note is excluded from evidence.

### B.    Other Documentary Records

Exhibits 2 and 12 are inadmissible.[11]  The Government made no effort at trial to lay a foundation for the authenticity of these documents.  To the extent that the documents are attached to purported certifications from the Department of Homeland Security, these

---

[11] These documents contain:
-Petitioner's father's Registration for Refugee Status (Ex. 2);

-a departure record from the government's files (Ex. 12).
    Various other documents from Petitioner's immigration "A-file" are likewise inadmissible, but these documents contain facts that are generally ancillary to the Court's analysis.  The Court refrains from discussing these documents further.

certifications fail to include a seal from the agency itself, Fed. R. Evid. 902(1), or a seal from an officer who certifies that the signer of the Department of Homeland Security certifications has capacity to do so, Fed. R. Evid. 902(2).  Although such self-authenticating seals are not required, see Fed. R. Evid. 901(a), the proponent of the evidence bears the burden of introducing extrinsic "**evidence** sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  The Government has failed to introduce **any** live testimony or other admissible evidence to establish that Exhibits 2, 10, and 12 are authentic.  These documents are accordingly inadmissible.[12]

Various other documents submitted by Petitioner and his family when emigrating are adequately authenticated and are admissible hearsay, under Rule 803, or non-hearsay, under Rule 801.  These documents are discussed *infra*.

**IV.  FINDINGS OF FACT**

The Court has reviewed various documents submitted by the parties. The Court has also received live testimony from two witnesses, Susanna

---

[12] Notably, although the Government has introduced a number of certified copies of government documents, the Government has failed to satisfy Fed. R. Evid. 902(4), which treats certified copies as self-authenticating **if** they are accompanied by a "certificate complying with paragraph (1), (2), or (3) of this rule" – i.e., that there is a proper official seal.  Absent any authentication of the certified copies by way of extrinsic evidence or a separate government document under seal, certified copies are nothing more than glorified photocopies.  The relevant question is whether those copies came from a proper government source; a certified copy fails to attest to this foundational fact.  Extrinsic evidence – either in the form of live testimony or admissible hearsay – is necessary to lay a foundation for government records.  The Government has not introduced any such extrinsic evidence.

Demirchyan and Avag Demirchyan, and has reviewed the deposition transcript from Petitioner's deposition in this matter.  Based on the evidence in the record, the Court makes the following findings of fact.

### A.   Background

Petitioner was born in Armenia, which was then a part of the Union of Soviet Socialist Republics ("Soviet Union").  Petitioner and his family were admitted to the United States as Lawful Permanent Residents on October 23, 1988.  Petitioner's mother was naturalized on December 9, 1994.

Petitioner was convicted of perjury and possession of cocaine in September 1998.  Because of these convictions, Petitioner received a notice of removal from immigration authorities in August 2000.  During removal proceedings, Petitioner asserted that he was a United States citizen on account of his mother's naturalization in 1994, as per 8 U.S.C. § 1432(a) (West 1994).  Following administrative proceedings, the instant action was filed in 2008 in order to allow a *de novo* review of Petitioner's citizenship claim.[13]

### B.   Pre-Emigration Documents

During the process of emigrating to the United States, Petitioner's family prepared and submitted a number of documents that reflect a birthdate of 1976.

### 1.   Petitioner's Registration Documents

The starting point of the Court's factual findings is Petitioner's own admission that he was born in 1976.  In his Registration for Classification as Refugee, Petitioner's date of birth is listed as

---

[13] Because the Court must review the parties' evidence *de novo*, it refrains from discussing the details of the procedural history in the immigration courts.

1976.  (Ex. 6 at 6-2; <u>see also</u> Ex. 7 (identical document prepared in foreign language).)  Petitioner (or somebody acting on his behalf) signed a sworn affirmation to attest to that fact.  (Ex. 6 at 6-2.) The affirmation was done in the presence of an official at the United States embassy in Moscow.  (<u>Id.</u>)[14]  This document is admissible to prove the fact that Petitioner was born in 1976.[15]

### 2.   Birth Certificate Obtained in 1988

In order to obtain the necessary approval to emigrate to the United States, Petitioner and his family submitted Petitioner's birth certificate to the United States embassy in Moscow.  Petitioner's mother credibly testified against her own interest that Exhibits 8 and 9 contain a copy and translation of the birth certificate submitted to the embassy in Moscow.  This birth certificate was issued in July 1988, and states that Petitioner was born in 1976.  The birth certificate further states that "the registration of birth was conducted in accordance with the law of the year 1976 month of July 31st day" – in other words, that the birth was registered pursuant to law on July 31, 1976, four days after the birth.  (Ex. 9, at 9-1.)

Based on Petitioner's mother's testimony and the distinctive characteristics of this document, the Court concludes by a

---

[14] The document states on its face that it was affirmed in the presence of the United States embassy official, which is consistent with the testimony of both Susanna and Avag Demirchyan.

[15] The document is adequately authenticated by the testimony of Avag Demirchyan, who stated that he personally observed these documents being submitted to the United States embassy.  <u>See</u> Fed. R. Evid. 901(b)(1) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by . . . [t]estimony that a matter is what it is claimed to be.").  The document contains admissible non-hearsay statements that are an admission by a party-opponent under Fed. R. Evid. 801(d)(2).

preponderance of the evidence that this document is authentic.  See

Fed. R. Evid. 901(b)(1),(4) ("The requirement of authentication or

identification as a condition precedent to admissibility is satisfied

by . . . [t]estimony that a matter is what it is claimed to be," or the

"[a]ppearance, contents, substance, internal patterns, or other

distinctive characteristics, taken in conjunction with

circumstances.").  Furthermore, the contents of the document set forth

sufficient facts to satisfy the public records exception to the hearsay

rule.  The document states on its face that the date of birth was

recorded pursuant to a legal duty.  See Fed. R. Evid. 803(8)(B).

    The 1988 birth certificate is distinguishable from the birth

certificate at issue in United States v. Pintado-Isiordia, 448 F.3d

1155 (9th Cir. 2006).  In that case, the Ninth Circuit held that a

Mexican birth certificate was inadmissible hearsay because there was no

evidence that the birth certificate "was a record of matters 'observed

pursuant to duty imposed by law.'"   Id. at 1157 (quoting Fed. R. Evid.

803(8)).  The court noted that the document would have satisfied this

hearsay exception but for the fact that "[t]he portion of the document

that purports to set forth the legal authority for maintaining the

record is shown as 'illegible' in the translated copy."  Id.  In the

present case, in contrast, the translation - which Petitioner has not

disputed - reveals that the birth was registered pursuant to law.  The

Court therefore concludes by a preponderance of the evidence that the

1988 birth certificate satisfies the public records hearsay exception.

    In the alternative, the Court concludes that the birth certificate

is a non-hearsay adoptive admission by a party-opponent.  Petitioner

and/or his agent (either his mother or father) submitted this document

to United States authorities as evidence of the fact that Petitioner was born in 1976.  The document is therefore non-hearsay under Fed. R. Evid. 801(d)(2)(B), which provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth."

### 3.   Summary of Admissible Direct Evidence Provided to United States Embassy that Proves the Fact that Petitioner was Born in 1976

Accordingly, the Court concludes that a pair of documents contain admissible factual assertions establishing that Petitioner was born in 1976.  First is Petitioner's own representation on the Registration document that he was born in 1976.  (Ex. 6.)  Second is Petitioner's 1988 birth certificate showing a birth date in 1976.  (Exs. 8-9.)  This birth certificate contains admissible factual evidence either in the form of a public record from the Armenian government or an adoptive admission by Petitioner.

### C.   The Court is Unpersuaded by the Testimony to the Contrary

Petitioner presented two witnesses who disputed the accuracy of Petitioner's submissions to the United States embassy.[16]

Petitioner's mother Susanna Demirchyan claims that when the family

---

[16] The Court has also considered the deposition testimony of Petitioner himself, but finds that testimony to be both incredible (due to Petitioner's clear bias and to his former perjury convictions, Fed. R. Evid. 609(a)(2)) and wholly lacking in personal knowledge, see Fed. R. Evid. 602.  Based on Petitioner's own admissions in the deposition testimony, the Court concludes that Petitioner does not have a reliable and accurate first-hand recollection of the events at issue in this dispute.  The Court therefore discounts Petitioner's testimony and refrains from discussing it further.

was visiting the United States embassy in Moscow to prepare their paperwork, she first observed that Petitioner's birth date was erroneously listed as 1976 on various documents being prepared by embassy officials.  She says that she did not speak up because (1) she did not speak English, (2) the family had already made travel arrangements, and (3) their departure date was imminent.

Having observed Susanna's appearance and demeanor during her testimony, the Court did not find her to be credible regarding the origins of the 1976 birth date on the emigration documents. Furthermore, the Court finds it incredible that Petitioner's family would have obtained that birth certificate sometime between July 1988 and October 1988 without examining it to determine its accuracy and would have submitted this birth certificate to the United States embassy without knowing about an obvious inaccuracy such as an incorrect date of birth.  The Court therefore concludes that Susanna's testimony regarding the purported origins of the 1976 birth date is inaccurate.

Likewise, Petitioner's brother Avag asserts with uncanny precision that he remembers watching the embassy officials prepare the family's emigration documents.  On cross-examination, however, he contradicted himself by stating that he was a child at the time the family prepared the paperwork at the Moscow embassy and that he only heard about the erroneous documents from his parents.  He also claimed that he does not specifically recall any of the family's emigration documents other than his brother's.  The Court finds it incredible that Avag would retain a detailed memory of his brother's documents while being completely unaware of any other documents.  The Court finds it incredible that the

witness's memory is this accurate and specific after nearly twenty-three years have elapsed following the event.  In addition, the court notes that Avag's testimony left the Court with the impression that he believes the 1976 birth date arose from an **embassy official**'s clerical error.[17][17]  This assertion is belied by the Susanna's testimony that the family provided this 1988 birth certificate to the embassy officials, and this birth certificate clearly states that Petitioner was born in 1976.

In addition to the general incredibility of the two witnesses, both in their demeanor and the contents of their testimony, the Court further concludes that the record contains ample documentary evidence that impeaches these witnesses.[18]

Exhibit 1 contains a Registration document from 1988 in which Petitioner's father signed a sworn affirmation to attest to that fact that Petitioner's birth date was in 1976.  (Ex. 1, at 1-1.)[19]   Exhibit

---

[17] At times during her testimony, Avag either explicitly stated or, in the Court's recollection, strongly implied that the 1976 birth date arose from an embassy official's clerical error.

[18] The Court notes that the following documents are not being relied upon for the truth of their contents but rather were introduced as impeachment evidence.  Accordingly, the hearsay rules do not apply to these documents.  See Fed. R. Evid. 801(c) ("'Hearsay' is a statement . . . offered in evidence to prove the truth of the matter asserted.").

[19] Based on Petitioner's brother's testimony regarding the submission of various documents to the embassy, combined with the distinctive characteristics of this document, the Court concludes by a preponderance of the evidence that this document is adequately authenticated.  See Fed. R. Evid. 901(b)(1),(4) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by . . . [t]estimony that a matter is what it is claimed to be," or the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.").

3 contains a similar document signed by Petitioner's mother, which also states that Petitioner was born in 1976. (Ex. 3, at 3-1; see also Ex. 4 (identical document in foreign language).)[20]  Exhibit 5 contains a 1994 application for naturalization in which Petitioner's mother signed a sworn affirmation to attest to the fact that Petitioner's birth date was in 1976. (Ex. 5, at 5-2.)[21]  Exhibit 10 contains a record of a medical exam conducted prior to Petitioner's departure from Armenia.[22]

The witnesses failed to offer any credible explanation for the discrepancies between these documents and their in-court assertion that Petitioner was born in 1977. The Court therefore concludes that the witnesses' testimony wholly lacks credibility.

In addition, because the Court finds these two witnesses to be biased and incredible, the Court refuses to credit their assertions that they specifically remember Petitioner's birth in 1977. Having observed the appearance and demeanor of these witnesses, the Court concludes that their purported recollections are untruthful.

Accordingly, the Court therefore refrains from crediting the witnesses' purported first-hand memories of Petitioner's birth. The

_____

[20] Based on Petitioner's mother's testimony, combined with the distinctive characteristics of this document, the Court concludes by a preponderance of the evidence that this document is adequately authenticated. See Fed. R. Evid. 901(b)(1),(4).

[21] Based on Petitioner's mother's testimony, combined with the distinctive characteristics of this document, the Court concludes by a preponderance of the evidence that this document is adequately authenticated. See Fed. R. Evid. 901(b)(1),(4).

[22] Based on Petitioner's mother's testimony, combined with the distinctive characteristics of this document, the Court concludes by a preponderance of the evidence that this document is adequately authenticated. See Fed. R. Evid. 901(b)(1),(4).

Court also refrains from crediting their claims that they first saw Petitioner's birthdate listed as 1976 when they were completing their emigration paperwork at the Moscow embassy.

### D.    Later-Acquired Documentary Evidence

Following Petitioner's initial legal difficulties in the United States - i.e., after the Demirchyan family had a motive to prove that Petitioner was born in 1977 - Petitioner's mother traveled to Armenia to collect documents purportedly showing Petitioner's birth date as 1977.  She obtained various documents and records from hospitals, medical clinics, and schools.  She also obtained additional birth certificates that contradicted the earlier birth certificate submitted to the United States embassy in 1988.  For the following reasons the Court finds that these documents are inadmissible hearsay.  (And even if these documents were admitted and credited, they would fail to satisfy Petitioner's burden of proving that he is a United States citizen.)

Specifically, Petitioner seeks to present the following groups of documentary evidence to show that he was born in 1977:

> (1) birth certificate issued by Armenia in 2000, serial number #004157 (Ex. 108);
>
> (2) school and medical records from Armenia stating that Petitioner was born in 1977 (Exs. 101, 102, 103, 104, 105).

### 1.    Authentication

Petitioner's school and medical documents are self-authenticating by operation of the Hague Convention apostilles attached to their face. See 1961 Hague Convention Abolishing the Requirement of Legalisation for Foreign Public Documents, 527 U.N.T.S., T.I.A.S. 10072; Fed. R.

Civ. P. 44(a)(2) ("[F]inal certification is unnecessary if the record and the attestation are certified as provided in a treaty or convention to which the United States and the foreign country in which the official record is located are parties."); see also United States v. Pintado-Isiordia, 448 F.3d 1155, 1157 (9th Cir. 2006) (holding that Mexican birth certificates were adequately authenticated by apostilles that conformed to Hague Convention protocol).

Petitioner's birth certificate (issued in 2000) is authenticated indirectly through (1) an Armenian notary's certification that the document is a true and correct copy of the original and (2) a United States embassy official's certification under seal stating that the Armenian notary was empowered to act as a notary.  These documents proving chain-of-custody, if otherwise admissible (i.e., under hearsay and other rules), satisfy the requirement of Fed. R. Evid. 902(3) allowing admission of "a copy that is attested to by a person authorized to make the attestation and is accompanied by a certification as to the genuineness of the signature and official position of the attesting person."  2 Business and Commercial Litigation in Federal Courts § 18:106 (2d ed.).

### 2.   Hearsay

Despite the fact that these documents are adequately authenticated, the court concludes for the following reasons that Petitioner's documents are inadmissible hearsay.

### a.   School and hospital records

The caselaw regarding the public records hearsay exception (see supra) establishes that Petitioner's school and hospital records are inadmissible hearsay.  Most of these documents fail to show that the

declarant (i.e., the person who originally entered the record in Armenia and/or the person who transcribed that record to create the documents now being introduced) had personal knowledge of the facts being asserted (i.e., the date of Petitioner's birth).  See Fed. R. Evid. 602; 5 Weinstein's Federal Evidence, § 803.10[4][a](citing Perlmuter, 693 F.2d at 1293-94; Chu Kong Yin, 935 F.2d at 999).

Furthermore, nothing about the inoculation records or school records (Exs. 102-105) satisfies the public records hearsay exception. Although these documents list Petitioner's birth year, they plainly do not "set forth the activities of the" school or hospital relating to Petitioner's birth date, Fed. R. Evid. 803(8)(A), set forth facts which there was a duty for the hospital or school to report, Fed. R. Evid. 803(8)(B), or contain factual findings based on an investigation done pursuant to the school or hospital's legal authority, Fed. R. Evid. 803(8)(C).

It is a closer call to decide whether to admit the certificate from the Malatia Medical Center stating that Petitioner was born in 1977. (Ex. 101.)  It is possible that the document fundamentally rests on personal knowledge — after all, someone at the hospital must have been present when Petitioner was born, and the hospital's records are almost certainly based on this first-hand information.  However, the Court is not in a position to speculate about the possibility that some person at some point in time had personal knowledge of certain facts. A useful analogy is United States v. Perlmuter, 693 F.2d 1290 (9th Cir. 1982), in which the Court excluded evidence of the defendant's prior criminal history provided by the Israeli National Police.  Although it is likely that **some** Israeli police officers at **some** point in time had

personal knowledge of the defendant's arrests, the Court excluded the police department's criminal history report "[b]ecause there is no indication that Herstig, **the person who signed the conviction report** . . . had first hand knowledge of the convictions." Id. at 1293 (emphasis added).

Here, the Malatia Medical records were issued in 2005 and state that, although the information is "approved by registration books," the record was "issued to submit on demand."  At the initial evidentiary hearing, Petitioner conceded that this document was essentially a "summary sheet" derived from the hospital's original records.  (See Tr. at 43.)  Nothing in the hospital's certification letter sets forth any facts satisfying the public records hearsay exception.  The letter does not "set forth the activities of the office of agency," Fed. R. Evid. 803(8)(A) — it merely summarizes facts contained in the hospital's records.  Nor does the letter set forth facts which there was a duty for the hospital to report, Fed. R. Evid. 803(8)(B), or contain factual findings based on an investigation done pursuant to the hospital's legal authority, Fed. R. Evid. 803(8)(C).  Accordingly, the Malatia Medical records are inadmissible hearsay.

### b.   Birth Certificate Issued in 2000

The birth certificate obtained by Petitioner's mother in 2000 states that Petitioner was born in 1977.  The Court concludes that the birth certificate is inadmissible hearsay with respect to the factual question of Petitioner's birth date.

As with the school and hospital records, the birth certificate simply fails to satisfy the public records hearsay exception of Fed. R. Evid. 803(8).  The birth certificate does not "set forth the activities

of the office of agency," Fed. R. Evid. 803(8)(A), does not set forth facts which there was a legal duty to report, Fed. R. Evid. 803(8)(B), and does not contain factual findings based on an investigation done pursuant to any legal authority, Fed. R. Evid. 803(8)(C).

Unlike the birth certificate issued in 1988 and submitted by Petitioner's family to the United States embassy, the birth certificate issued in 2000 to Petitioner's mother does not state on its face that the birth was recorded pursuant to a legal duty or that the birth certificate was prepared pursuant to a legal duty. Absent such *prima facie* evidence satisfying the public records hearsay exception, the birth certificate is inadmissible hearsay. <u>See, e.g.</u>, <u>United States v. Pintado-Isiordia</u>, 448 F.3d 1155 (9th Cir. 2006). Furthermore, unlike the 1988 birth certificate, the 2000 birth certificate is not a non-hearsay adoptive admission by a party-opponent. <u>See</u> Fed. R. Evid. 801(d)(2).

Accordingly, the birth certificate issued in 2000 is inadmissible hearsay. The birth certificate is inadmissible to prove its factual contents (i.e., that Petitioner was born in 1977).[23]

**V.   CONCLUSIONS OF LAW**

---

[23] Furthermore, even if the 2000 birth certificate were admissible hearsay, the Court would refrain from crediting the facts stated in the document. The document emerged under suspicious circumstances – namely, Petitioner's mother's fact-gathering trip to Armenia in order to forestall Petitioner's deportation – and there are no independent indicia of reliability to suggest that the birth certificate contains an accurate and truthful statement of fact. There are simply too many question marks surrounding this document for it to sustain Petitioner's burden of establishing by a preponderance of the evidence that he was born in 1977. In light of the strong evidence showing that Petitioner was born in 1976, the Court would refrain from crediting this suspicious birth certificate issued in 2000.

"Evidence of foreign birth . . . gives rise to a rebuttable presumption of alienage, and the burden then shifts to the petitioner to prove citizenship." Martinez-Madera v. Holder, 559 F.3d 937, 940 (9th Cir. 2009) (quoting Scales v. I.N.S., 232 F.3d 1159, 1163 (9th Cir. 2000)). It is undisputed that Petitioner was born in Armenia. Petitioner therefore bears the burden of proving that he is an American citizen. Lim v. Mitchell, 431 F.2d 197, 199 (9th Cir. 1970); see also Carrillo-Lozano v. Holder, No. CV-09-1948-PHX-NVW, 2010 WL 2292981, at *1 (D. Ariz. June 8, 2010) (same); Anderson v. Holder, No. CIV. 2:09-2519 WBS JFM, 2010 WL 1734979, at *3 (E.D. Cal. Apr. 27, 2010) (same).

The parties, in their initial Joint Statement re: New Case Status Conference, agreed that Petitioner bears the burden of proving his citizenship. [Docket no. 8, at 2-3 ("The parties agree that Demirchyan must prove four essential facts in order to be eligible for derivative citizenship. . . . To date, the administrative and judicial proceedings have focused on the . . . requirement [that his mother was naturalized before he turned eighteen].")

Based on the Court's findings of fact, the Court concludes as a matter of law that Petitioner has failed to meet his burden of proving that he is a United States citizen. Petitioner has failed to prove that he was born in 1977 – i.e., that he was under the age of 18 at the time that his mother was naturalized in 1994. The Court has concluded that the entirety of the admissible and credible evidence supports a finding that Petitioner was born in 1976. The only evidence to the contrary was either inadmissible as a matter of law or incredible.

Accordingly, Petitioner is not entitled to citizenship under 8 U.S.C. § 1432(a) (West 1994).

**VI.   CONCLUSION**

     The Petition is accordingly DENIED.   The Government shall file a proposed final judgment within five days.


          IT IS SO ORDERED.


DATED: September 8, 2010

                                  STEPHEN V. WILSON

                              UNITED STATES DISTRICT JUDGE

40