1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


ARUTYUN DEMIRCHYAN,                    )      CV 08-3452 SVW (MANx)
                                       )
                    Petitioner,        )
                                       )      SUPPLEMENTAL FINDINGS OF FACT
          v.                           )      AND CONCLUSIONS OF LAW
                                       )
ALBERTO R. GONZALES, Attorney          )
General,                               )
                                       )
                    Respondent.        )
_____ )


**I.   INTRODUCTION AND BACKGROUND**

     On May 5, 2008, the Ninth Circuit transferred this action to this
Court pursuant to 8 U.S.C. § 1252(b)(5) in light of genuine issues of
material fact regarding Petitioner's claim to citizenship.  See
Demirchyan v. Mukasey, 278 Fed. Appx. 778, 779 (9th Cir. 2008).  The
Court was charged with conducting a de novo hearing to evaluate
Petitioner Arutyun Demirchyan's claim that he is a United States
citizen.  Id.  This determination turns on whether Petitioner was born
in 1976 or 1977.  If, as Petitioner claims, he was born in 1977, then
he is entitled to derivative U.S. citizenship because he was under the
age of 18 when his mother became a U.S. citizen.  However, if
Respondent is correct that Petitioner was born in 1976, then he is

ineligible for derivative citizenship because he was over the age of majority when his mother naturalized.  See 8 U.S.C. § 1432(a) (West 1994), *repealed by* Child Citizenship Act of 2000, § 103, Pub. L. No. 106-395, 114 Stat. 1631.[1]  Absent such derivative citizenship, Petitioner is subject to the removal order issued against him in 2000.

To resolve Petitioner's status, the Court held evidentiary hearings on August 25, 2009 and June 16, 2010.  (Dkt. 25, 41).  On September 8, 2010, the Court issued its Findings of Fact and Conclusions of Law, holding that Petitioner was not a U.S. citizen because he failed to prove by a preponderance of the evidence that he was born in 1977.  See Demirchyan v. Gonzales, No. CV 08-3452 SVW (MANx), 2010 WL 3521784 (C.D. Cal. Sept. 8, 2010).  In so concluding, the Court principally relied on two documents indicating that Petitioner was born in 1976: (1) his Registration for Classification as Refugee; and (2) a copy of Petitioner's birth certificate issued in July 1988, which he submitted to the United States embassy in Moscow to emigrate to this country ("1988 Birth Certificate").  Id. at *13.

---

[1]At the relevant time period, the operative statute provided:
> A child born outside of the United States of alien parents, or of an alien parent and a citizen parent who has subsequently lost citizenship of the United States, becomes a citizen of the United States upon fulfillment of the following conditions:
> . . .
> (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents . . . ; and if
> (4) **Such naturalization takes place while such child is under the age of eighteen years;** and
> (5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of . . . the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a) (West 1994) (emphasis added).

Conversely, the Court rejected other items of evidence that purported to show that Petitioner was born in 1977.  Most notably, the Court rejected a copy of another birth certificate issued by Armenia in 2000 ("2000 Birth Certificate") on the ground that it was inadmissible hearsay, since it failed to satisfy the public records exception.  _Id._ at *18.  Additionally, the Court rejected as incredible the testimony of (1) Petitioner's mother, who averred that the 1988 Birth Certificate was inaccurate; and (2) Petitioner's brother, who suggested that the 1988 Birth Certificate was the product of a clerical error.  _Id._ at *15.  In short, the Court concluded that Petitioner was not a U.S. citizen pursuant to 8 U.S.C. § 1432(a), and returned the matter to the Ninth Circuit for further proceedings.  _Id._ at *18-19.

Upon return to the Ninth Circuit, Petitioner filed a motion to supplement the record with "new" evidence.  Fed. R. App. P. 10(e)(2).  Instead of granting the motion, the Ninth Circuit concluded that "there continues to be an unresolved 'genuine issue of material fact about the petitioner's nationality.'"  (Dkt. 61).  Accordingly, the panel returned the case to this Court "in order to permit the parties to move . . . for admission of documents not previously presented there, and to permit the district court to reconsider its findings of fact and conclusions of law in light of any such evidence it deems admissible."  (_Id._).

On July 19, 2011, pursuant to the Ninth Circuit's order, Petitioner lodged with this Court twelve "new" Exhibits A through L. (Dkt. 65).  The most prominent of these documents appears to be a copy of Petitioner's birth certificate issued by Armenia in 1997, which indicates a birthdate of July 27, 1977 ("1997 Birth Certificate").

(Dkt. 65, Ex. A).  The remaining eleven exhibits also show a birth year of 1977, including copies of two U.S. passports issued to Petitioner (Exs. B, C); a copy of an Armenian passport (Ex. D); a copy of Form I-90 application to replace Permanent Resident Card filled out by Petitioner in December 2001 (Ex. E); various pages from the Immigration and Naturalization Service ("INS") database (Exs. F-K); and a copy of an Application for Certificate of Citizenship submitted by Petitioner in October 2000 (Ex. L).

On July 25, 2011, the Court explained that it read the Ninth Circuit's transfer order to mean that the Court must "determine whether the new documents attached on Appeal are admissible and then make changes to its findings, if necessary." (Dkt. 68).  To this end, the Court ordered the Petitioner "to file a memorandum with attached declarations that allow the Court to determine whether the documents are admissible," and "if [they] are found admissible, why they should change the Court's earlier findings." (Id.).  Petitioner complied (Dkt. 69), and Respondent filed a response (Dkt. 71).

On October 24, 2012, the Court conducted further evidentiary hearing to elicit testimony from witnesses who could speak to these "new" exhibits, in particular the purported 1997 Birth Certificate. (Dkt. 79, 82).  The Court heard testimony from (1) Petitioner Arutyun Demirchyan; (2) Petitioner's mother, Susanna Demirchyan; (3) Asatur Guyumjyan; and (4) Zara Hovanisyan.  (Dkt. 86).[2]

Having reviewed the parties' briefing, documentary evidence, and live testimony with respect to these "new" exhibits, and taking into

---

[2] The Court will detail below the testimony of these persons as necessary in the course of its findings of fact.

account the Court's previous findings and conclusions, the Court now re-examines the merits of Petitioner's claim.

## II.   FINDINGS OF FACT

The Court set forth several findings of fact in its previous Order dated September 10, 2008, which need not be repeated here.  _Demirchyan_, 2010 WL 3521784 at *13-18.  Since then, the Court has received Petitioner's submission of twelve "new" exhibits as well as affidavits and oral testimony from witnesses in support of these documents.  The sole inquiry is whether such evidence leads the Court to alter its original findings.  Having reviewed these evidentiary submissions and related pleadings, the Court makes the following additional factual findings.

### A.   1997 Birth Certificate (Exhibit A)

Petitioner has submitted a copy of a birth certificate that, based on the English translation, appears to have been issued by Armenia on April 29, 1997, and which states that Petitioner was born on July 27, 1977.  (Dkt. 65, Ex. A).

Before it can discern the evidentiary value of the 1997 Birth Certificate, the Court must determine if it is admissible.  "Hearsay and authentication are separate and independent requirements for evidentiary admissibility."  _Demirchyan_, 2010 WL 3521784, at *3.  The Court addresses the document's authenticity first.

#### 1.   Authentication

A document may be authenticated by virtue of its own contents, Fed. R. Evid. 902, or on the basis of extrinsic evidence "sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).

**a.   Self-Authentication**

The 1997 Birth Certificate is not self-authenticating.  Title 28 U.S.C. § 1741 provides that "[a]n official record or document of a foreign country may be evidenced by a copy, summary, or excerpt as authenticated as provided in the Federal Rules of Civil Procedure."  28 U.S.C. § 1741.  The Federal Rules of Civil Procedure provide:

> (A)  *In General*. Each of the following evidences a foreign official record--or an entry in it--that is otherwise admissible:
>
> (i)  an official publication of the record; or
> (ii) the record--or a copy--that is attested by an authorized person and is accompanied either by a final certification of genuineness or by a certification under a treaty or convention to which the United States and the country where the record is located are parties.
>
> (B)  *Final Certification of Genuineness*. A final certification must certify the genuineness of the signature and official position of the attester or of any foreign official whose certificate of genuineness relates to the attestation or is in a chain of certificates of genuineness relating to the attestation. A final certification may be made by a secretary of a United States embassy or legation; by a consul general, vice consul, or consular agent of the United States; or by a diplomatic or consular official of the foreign country assigned or accredited to the United States.
>
> (C)  *Other Means of Proof*. If all parties have had a reasonable opportunity to investigate a foreign record's authenticity and accuracy, the court may, for good cause, either:
>
> (i)  admit an attested copy without final certification; or
> (ii) permit the record to be evidenced by an attested summary with or without a final certification.

Fed. R. Civ. P. 44(a)(2).[3]  Under the Hague Convention, a model

---

[3]  Federal Rule of Evidence 902(3) also governs the authenticity of evidence consisting of foreign public documents.  Rule 902(3) is substantively identical to Fed. R. Civ. P. 44, except that it does not mention the alternative method of certification pursuant to a treaty or convention.

apostille may be used in place of the final certification demanded under Rule 44(a)(2)(A)(ii).  See United States v. Nunez-Beltran, No. 10cr522 JM(CAB), 2010 WL 2985490, at *4 (S.D. Cal. July 26, 2010).

None of the foregoing conditions are met here.  Petitioner has submitted an unofficial photocopy of the 1997 Birth Certificate.  (Dkt. 65, Ex. A).  Though the English translation is notarized, it is unclear what the notary is attesting to.  In any event, the 1997 Birth Certificate is not accompanied by any "final certification of genuineness" or model apostille under the Hague Convention indicating that the notary was authorized to attest to the document's authenticity.  Fed. R. Civ. P. 44(a)(2)(A)(ii).  Moreover, for reasons explained further below, the Court does not find that good cause exists to relax the certification requirement.  Fed. R. Civ. P. 44(a)(2)(C).  Therefore, the document's authenticity is not self-evident.

### b.  Extrinsic Evidence

Even where self-authentication is unavailable, however, a document may still be authenticated through extrinsic evidence "sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a); see Vatyan v. Mukasey, 508 F.3d 1179, 1183-84 (9th Cir. 2007).  For example, in Vatyan, the Court held that the immigration judge erred in refusing to consider the petitioner's own testimony that his Armenian documents bore certain indicia of authenticity.  Id. at 1184-85.  However, just because a judge *may* consider such testimony "does not mean that the [judge] *must* accept the documents into evidence or deem their contents to be true."  Id.  That decision ultimately will depend on the strength of the evidentiary showing of authenticity.

### i.   Petitioner's Allegations

The Court begins with the alleged provenance of the 1997 Birth Certificate.  To support the authenticity of the 1997 Birth Certificate, Petitioner relies on the written and oral testimony of (1) himself; (2) his mother, Susanna Demirchyan; (3) his former neighbor in Armenia, Asatur Guyumjyan; and (4) his girlfriend's mother, Zara Hovanisyan.  Their collective testimony is summarized below.

In or about 1992, Petitioner's mother, Susanna Demirchyan ("Susanna") sent a power of attorney to her former neighbor in Armenia, Lusine Jambaryan, to obtain a "corrected" birth certificate for Petitioner from Armenian authorities.  (Dkt. 69, Ex. B ("Susanna Aff.") ¶ 19).  This attempt failed because Jambaryan committed suicide.  (Id. ¶ 20).  In or about 1996, Susanna asked and authorized another former neighbor in Armenia, Asatur Guyumjyan ("Guyumjyan"), to obtain a birth certificate for Petitioner.  (Id. ¶ 20).  Susanna avers that "in 1997 Asatur arranged for someone to bring the corrected birth certificate to me."  (Id.).

According to Guyumjyan's affidavit, he personally went to the City Hall in Yerevan, Armenia, to fill out the request for a birth certificate.  (Dkt. 69, Ex. M ("Guyumjyan Aff.") ¶ 8).  Approximately two weeks later, Guyumjyan returned to City Hall to retrieve the certificate.  (Id. ¶ 10).  Guyumjyan states in his affidavit that "[s]oon after receiving the birth certificate, [he] found out about a person who was travelling from Armenia to the United States . . . met this person at the airport and gave them [Petitioner's] certified birth certificate for delivery in the United States."  (Id. ¶ 11).

In the fall of 1997, Susanna claims that she and Petitioner

visited the INS office in Los Angeles to present a copy of the 1997 Birth Certificate.  (Susanna Aff. ¶ 21).  She avers that upon their arrival, an INS agent instructed them to mail the original, along with a translation, to the INS.  (Id. ¶ 21).  Susanna states in her affidavit that she complied.  (Id. ¶ 22).  According to her, the next time she saw the 1997 Birth Certificate was at Petitioner's removal proceedings in 2000, when the INS attorney handed the certificate to the immigration judge.  In Susanna's words, the birth certificate "was not in the best of shape" at the time, and "the immigration judge commented that it was 'well worn.'"  (Id. ¶ 25).  The immigration judge asked Susanna to have the original 1997 Birth Certificate authenticated in Armenia.  (Id.).  Thus, in November 2000, Susanna returned to Yerevan to authenticate the 1997 Birth Certificate.  Instead of authenticating it, however, the Armenian official kept the 1997 document and issued a new birth certificate dated 2000, which also reflected a birthdate of July 27, 1977.  (Id. ¶ 25).

Petitioner also relies on the affidavit of Zara Hovanisyan to corroborate the authenticity of the 1997 Birth Certificate.  According to Petitioner, Hovanisyan has "extensive knowledge about Armenian Archives and the official practices of the Archives."  (Dkt. 69 at 11).  In her affidavit, Hovanisyan avers that she "clearly recognize[s]" the 1997 Birth Certificate as "consistent with one issued by the Armenian government."  (Dkt. 69, Ex. N ("Hovanisyan Aff.") ¶ 5).  In particular, she attests that the shape of the seal is "exactly the type" used by the Armenian government and located in the place where an archivist would put the seal.  (Id.).  She further testifies that the symbols, language, and layout of the document are "exactly those used by the

Armenian government on birth certificates." (Id.).  Accordingly, she

concludes that the 1997 Birth Certificate "is a valid document done

according to law." (Id.).

### ii.  Analysis

Although courts must consider extrinsic evidence relating to the

authenticity of a proffered document, this "does not mean that the

[Court] *must* accept the document[] into evidence or deem [its] contents

to be true."  Vatyan, 508 F.3d at 1185.  Courts "retain broad

discretion to accept a document as authentic or not based on the

particular factual showing presented."  Id.  In this case, although the

Court must consider the foregoing testimony "as evidence that is

relevant to the issue of the [certificate's] authenticity," the Court

"can assess the credibility of that testimony and determine whether the

balance of the evidence is sufficiently compelling to satisfy him that

the documents are what [its proponent] claims them to be."  Id.[4]  For

the reasons below, the Court concludes that the balance of evidence

presented by Petitioner is insufficient to persuade the Court that the

1997 Birth Certificate is genuine.

As a preliminary observation, the basic premise that Susanna

entrusted a tourist from Armenia to deliver her son's birth certificate

to the United States, when she could have used a mail delivery service,

---

[4]  In Vatyan, the Ninth Circuit elaborated that a court "need not accept all documents as authentic nor credit documentary submissions without careful scrutiny so long as the rejection is premised on more than a guess or surmise."  Id. at 1185 n.4 (internal quotation marks omitted).  Moreover, even if a court "concludes that the petitioner has presented sufficient prima facie evidence of a document's authenticity to admit it into evidence, the [court] as the trier of fact retains discretion to weigh the evidence's credibility and probative force."  Id. (internal citation and quotation marks omitted).

strikes the Court as fanciful.  Even forgetting this facial

peculiarity, however, the Court cannot accept the alleged provenance of

the 1997 Birth Certificate because it is marred, from start to finish,

by material gaps and troubling inconsistencies in the record.

### (a)  Who Obtained the Certificate

First, Guyumjyan testified that he obtained the 1997 Birth

Certificate from the city hall in Yerevan, Armenia in 1997.  However,

during Petitioner's deposition in May 2009, which was admitted into

evidence in the prior evidentiary hearing, Petitioner affirmatively

stated that it was his cousin, Hovhannes Kachanyan ("Hovhannes"), who

obtained the 1997 Birth Certificate from Armenian government.[5]  (Tr. II

at 8-10).  Petitioner never mentioned Guyumjyan's role until the

instant proceeding.

Guyumjyan testified that the copy of the 1997 Birth Certificate

entered into evidence is the "exact certificate" which he received from

the Armenian archives.  (Dkt. 86 ("Tr. II") at 93:9-25).  He has,

however, failed to supply any evidence that would tend to corroborate

that he obtained the certificate, such as a copy of the alleged power

of attorney provided to him, copies of paperwork filled out at the

Armenian City Hall, or receipts of payment for the birth certificate.

The absence of such documentary proof, along with the circumstantial

evidence discussed below, militates against the trustworthiness of

Guyumjyan's account.

---

[5] This is corroborated by Susanna's 2009 deposition testimony, in
which she likewise testified that her relative, not the neighbor,
obtained the 1997 Birth Certificate.  (Tr. II at 46:10-14).  However,
because her deposition has not been admitted into evidence, and
because Susanna did not confirm in court that she made this
statement, the Court refrains from relying on her inconsistent
deposition testimony.

### (b)   Who Found the Tourist

The witnesses have also made contradictory statements about how Guyumjyan located the mystery tourist.   Although the witnesses stated during the last evidentiary hearing that Guyumjyan identified and contacted the tourist through Hovhannes, who knew the tourist was coming to the United States, nowhere in the witnesses' previously filed affidavits do they even mention Hovhannes's key role.   (Compare Tr. II at 101:5-14 with Guyumjyan Aff. ¶ 12); (Compare Susanna Aff. ¶ 20 with Tr. II at 59:25-62:16); (Compare Tr. II at 39:5-7 with Dkt. 69-1 ("Pet. Aff.") ¶ 16).   Additionally, although Guyumjyan stated in his declaration that he delivered the certificate to the tourist at the airport, Guyumjyan averred in court that he and Hovhannes delivered the 1997 Birth Certificate to the tourist at his or her home.   (Compare Tr. II at 102-103, 112 with Guyumjyan Aff. ¶ 12).   The Court finds it highly suspect not only that these witnesses have equivocated on the most basic facts of this story, but that their memories have changed in lockstep.   This sort of parallel evolution in testimony is not a sign of reliability, but of orchestration.

### (c)   Who Was the Tourist

The most troubling aspect of the proffered account is the shroud of mystery that surrounds the purported tourist.   It is incredible that neither Guyumjyan nor Susanna remember the name or any traits of the tourist, whom they both met in person.   Such ignorance is especially difficult to comprehend given the gravity of the courier's task.   (Tr. II at 62-63, 102-103).   This glaring void in Guyumjyan's memory is all the more incredible when contrasted against his vivid memory that when he allegedly retrieved the 1997 Birth Certificate, he asked the

Armenian official why the stamp was incomplete, and the official responded that they did not have ink.  (Tr. II at 94:15-18).  It is likewise hard to accept that Susanna could not recall the circumstances of receiving the birth certificate from the tourist, such as whether they met at home or in public.  (Tr. II at 62-63).  Perhaps most implausible, though, is Susanna's in-court assertion that she was *not told* the name of the tourist.  (Tr. II at 62:22-23).  It defies common sense to believe that a person awaiting an important document to be delivered overseas by a stranger would not have been told, at a minimum, the name of the courier.

### (d)   What Happened to the 1997 Birth Certificate

There is also inconsistent testimony regarding the events that followed the alleged delivery of the 1997 Birth Certificate to Susanna in the United States.  Although Susanna stated in the 2009 evidentiary hearing that after receiving the 1997 Birth Certificate, she gave it to her son and did nothing more with it, she contradicted herself in the recent hearing by testifying that she accompanied her son to the INS office to try to update his records with the 1997 Birth Certificate.  (Compare Dkt. 26 ("Tr. I") at 24:1-13, Tr. II at 52:2-5 with Tr. II at 64:18; Susanna Aff. ¶ 21).[6]  Tellingly, the 1997 Birth Certificate was not at issue at the time of the 2009 hearing, which focused on the authenticity of the 2000 Birth Certificate.  Thus, it was only when the 1997 Birth Certificate became the crux of Petitioner's case that

---

[6] The Court notes that the foregoing documents are not being relied upon for the truth of their contents but rather were introduced as impeachment evidence.  Accordingly, the hearsay rules do not apply to these documents.  See Fed. R. Evid. 801(c) ("'Hearsay' is a statement . . . offered in evidence to prove the truth of the matter asserted.").

Susanna suddenly remembered additional details to flesh out the chain of events concerning the 1997 Birth Certificate.  Here again, Susanna's conveniently timed flip-flop substantially weakens the reliability of her account.

Susanna has also given contradictory versions of the chain of custody of the 1997 Birth Certificate after her visit to the INS.  In her affidavit, Susanna stated that after visiting the INS, she and Petitioner mailed the original birth certificate along with its English translation to the INS, and that she did not get the original back until the 2000 removal proceedings.  (Susanna Aff. ¶ 22).  In court, however, Susanna and Petitioner testified that they only mailed the translation to the INS, and that they kept the original in a box in her home.  (Tr. II at 34-35, 69-70).  Yet the immigration judge in 2000 observed that the 1997 Birth Certificate was "well worn."  (Susanna Aff. ¶ 24); (Dkt. 69, Ex. O at 363).  The Court cannot fathom how a birth certificate obtained in 1997 and kept in a box would become "well worn" in three years.  Susanna's apparent inability to set forth consistently these fundamental facts, combined with the general implausibility of her current story, seriously undermines the Court's confidence in the veracity of this account.

### (e)  Hovanisyan

Finally, although Zara Hovanisyan attested in her affidavit that the 1997 Birth Certificate is authentic, even if she was found truthful, there are gaps in the foundation for her testimony.  Even though Hovanisyan worked in the Armenian Archives between 1978 and 1983, her job as an "archival fund preserver" simply entailed recording documents before transferring them to the archives.  (Tr. II at 127).

She admitted in court that birth certificates were dealt with in a different division than hers, that her job description never included authenticating birth certificates, and that she never received training in that respect. (Tr. II at 123:9-17). As such, her experience with birth certificates is premised solely on the vague proposition that she has "had contact" with these documents. (Tr. II at 123:11-12, 137:4-7). Even crediting that statement, the Court has found no basis to infer that the birth certificates Hovanisyan encountered in 1983, including their stamps and symbols, even remotely resembled the birth certificates being issued fourteen years later in 1997. In other words, there is a lack of foundation to believe that Hovanisyan acquired the knowledge needed to recognize the style and symbols on the 1997 Birth Certificate to be genuine. In view of this threadbare foundation, the Court accords Hovanisyan's opinion minimal weight.[7]

### (f)   Potential Biases

In viewing the pervasive inconsistencies and gaps in the alleged provenance of the 1997 Birth Certificate, the Court's skepticism is only heightened by these key witnesses' obvious motivation to protect Petitioner. As already noted, Hovanisyan has known Petitioner for two years and her daughter currently is dating Petitioner. Guyumjyan and Petitioner grew up together, as their families were next door neighbors in Armenia for twelve years. (Guyumjyan Aff. ¶¶ 2-3). Susanna has a

---

[7] Hovanisyan's testimony is unreliable for the additional reason that her daughter, Angie Markosian, is currently dating Petitioner. (Tr. at 124-25). Hovanisyan further admitted on re-direct that Petitioner is her former son-in-law's friend, and that she has known Petitioner for close to two years. (Tr. at 125). Hovanisyan's lack of experience with authenticating birth certificates, coupled with her obvious motivation to protect her daughter's friend, renders her testimony incredible.

natural incentive to protect her child.  See Cuellar v. Joyce, 596 F.3d 505, 511 (9th Cir. 2010) (probative value of sister's report was "limited given the sister's likely bias," along with other factors). Even absent these potential biases, however, the Court would still reject the proffered explanation of the 1997 Birth Certificate's origin, for the reasons already discussed.

### (g)  General Observations

Two additional observations cause the Court to look askance at the foregoing testimony.  First, the form of Guyumjyan and Susanna's affidavits is nearly as troubling as their content.  Preliminarily, neither Guyumjyan nor Susanna's signed affidavits bear any date of execution.  Moreover, because Guyumjyan has trouble reading English, (Tr. II at 88:11-12), he signed his affidavit (written in English) only after reviewing it with a translator, who explained its contents to him in Armenian.  (Tr. II at 89:11-14, 97:16-23, 105:11-15).  Meanwhile, Susanna's original, signed affidavit was typed in Armenian, and subsequently translated into English by the same person who translated for Guyumjyan.  (Dkt. 69-2 at 6).  Disturbingly, this translator was Angie Markosyan, who is not only the daughter of another witness, Zara Hovanisyan, but who is currently in a dating relationship with Petitioner.  (Tr. II at 97, 105-106, 124-25).[8]  The fact of Markosyan's involvement alone casts an even darker shadow over the alleged

---

[8] The Court observed that Guyumjyan was evasive when questioned about the translator on cross-examination.  When Respondent asked him who translated his affidavit to him, Guyumjyan did not provide a name, but only stated, "Not a relative."  (Tr. II at 97:23).  This response is puzzling since Respondent never suggested that it was a relative.  Rather, it appears to be a transparent attempt to deflect attention from the fact that the translator was Petitioner's girlfriend.  The Court finds that Guyumjyan's defensive demeanor bolsters the conclusion that his testimony is unreliable.

1   provenance of the 1997 Birth Certificate.

2        Second, viewing the record generally, the fact that the 1997 Birth

3   Certificate was formally brought to this Court's attention for the

4   first time in the instant proceeding is itself cause to view the

5   document's authenticity with suspicion.  Petitioner contends that his

6   former counsel, James Rosenberg, was ineffective in failing to present

7   the 1997 Birth Certificate during the first iteration before this

8   Court.  For his part, Attorney Rosenberg has submitted an affidavit

9   stating that he did not offer the 1997 Birth Certificate because he did

10  not have an original version, and because he believed it was more

11  appropriate to submit the 2000 Birth Certificate, which bears a model

12  apostille.  (Dkt. 69, Ex. F ("Rosenberg Aff.") ¶ 4).

13       The Court finds this explanation unsatisfactory.  By the close of

14  the August 25, 2009 evidentiary hearing, it was already clear that the

15  2000 Birth Certificate's authenticity would be contested by Respondent.

16  Specifically, during that hearing, Respondent sought to introduce

17  testimony from the consular official in Yerevan, Armenia, stating that

18  the 2000 Birth Certificate was fraudulent.  (Tr. I. at 63-66).

19  Moreover, the Court continued the evidentiary hearing until June 15,

20  2010, and invited the parties to file supplemental briefs concerning

21  the consular official's diplomatic note concerning the authenticity of

22  the 2000 Birth Certificate.  (Dkt. 30, 34).  In view of foregoing, it

23  strains credulity to claim that Attorney Rosenberg continued to

24  withhold the 1997 Birth Certificate because he believed the 2000 Birth

25  Certificate was stronger evidence.  Rather, common sense dictates that

26  introducing the 1997 Birth Certificate during this intervening period

27  could have, at a minimum, helped to corroborate the origin of the 2000

28

Birth Certificate.

Nor can Petitioner hide behind the alleged ineptitude of Attorney Rosenberg, since Rosenberg was replaced by Attorney Platt on January 26, 2010, more than *five months before* the Court's second evidentiary hearing on June 16, 2010.  (Dkt. 33, 41).  Petitioner posits that Attorney Platt also misunderstood the importance of the 1997 Birth Certificate, but this is naked speculation.[9]  (Dkt. 69 at 6).  Given that the 2000 Birth Certificate's authenticity was drawn into doubt as early as August 2009, the logical response was to submit the 1997 Birth Certificate as supportive evidence.  Yet both Petitioner's attorneys declined to do so.  It is plausible to infer that neither attorney had faith in the 1997 Birth Certificate's admissibility.

*     *     *

In sum, the Court concludes that Petitioner has failed to produce credible extrinsic evidence "sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  The witnesses' collective account is fraught with gaps, inconsistencies, and biases, and the testimony of Hovanisyan is simply not probative.  Taken together, this evidence is insufficiently compelling to persuade the Court that the 1997 Birth Certificate is what Petitioner claims.  Vatyan, 508 F.3d at 1185.  Moreover, the 1997 Birth Certificate lacks the qualities to meet the criteria for self-authentication.  For all the foregoing reasons, the Court concludes that the 1997 Birth Certificate is inadmissible and shall be excluded from evidence.[10]

---

[9] Attorney Platt did not submit an affidavit, much less state what Petitioner claims.

[10] Furthermore, even if the 1997 Birth Certificate were admissible, the Court would refrain from crediting the facts stated in the

**B.   Passports (Exhibits B, C, D)**

Upon transfer from the Ninth Circuit, Petitioner also submitted for the Court's consideration copies of: (1) a United States passport issued in 2002; (2) a United States passport issued in 2009; and (3) an Armenian passport issued in 2007, all indicating Petitioner's birth year as 1977.  (Dkt. 65, Exs. B, C, D).

Even assuming these passports are admissible, they carry minimal weight.  The contents of these passports reflect the birth date reported by Petitioner in his applications.  However, the Court notes that the United States initiated removal proceedings against Petitioner in August 2000.  <u>Demirchyan</u>, 2010 WL 3521784, at *13.  Therefore, these passports are inherently unreliable because they were applied for after Petitioner had a motive to prove that his birth year was 1977.  As such, they are insufficient to overcome the substantial contrary evidence, highlighted in the Court's previous order, indicating that Petitioner's birth year is in fact 1976.[11]

---

document.  Not only is the alleged provenance of the document implausible on its face, it is founded upon the inconsistent and biased testimony of Petitioner's mother, childhood friend, and girlfriend's mother.  The fact that the 1997 Birth Certificate was first introduced to this Court at this late stage adds yet another layer of suspicion.  This weak evidentiary basis, mired in doubt, is insufficient to overcome the evidence from the Court's previous findings, which firmly showed that Petitioner was born in 1976.  Accordingly, even if it were admissible, the 1997 Birth Certificate would not alter the Court's prior order.

[11] Petitioner contends that his post-removal self-reporting of the 1977 birth date reflected his effort to "correct the record."  (Dkt. 69 at 19).  This assertion begs the question of Petitioner's true birthdate.  For the same reasons discussed in its previous order, the Court finds Petitioner's naked assertion to be both incredible (due to Petitioner's clear bias and to his former perjury convictions, Fed. R. Evid. 609(a)(2)) and lacking in personal knowledge, <u>see</u> Fed. R. Evid. 602.

1      **C.    Form I-90 & Form N-600 Applications (Exhibits E, L)**

2          Petitioner also attached (1) Exhibit E, a Form I-90 application to

3      replace a permanent resident card; and (2) Exhibit L, a Form N-600

4      application for certificate of citizenship, both of which indicate a

5      birthdate of July 27, 1977. (Dkt. 65, Exs. E, L).  However, these

6      forms were filled out by Petitioner after the United States commenced

7      removal proceedings against him.  As such, Petitioner's self-reported

8      birthdate is unreliable because he had an incentive to represent that

9      his birth year was 1977.  Accordingly, even assuming these exhibits are

10     admissible, the Courts finds that they are eclipsed by the

11     uncontroverted evidence arising prior to the removal proceedings

12     indicating a 1976 birth year.

13     **D.    INS Database Documents (Exhibits F-J)**

14         Exhibits F through J purport to be documents from INS records

15     reflecting Petitioner's birth year as 1977.  Petitioner claims he

16     received these documents from the United states in response to a FOIA

17     request. (Dkt. 69 at 18).  Similar to the passports, however, the

18     birth dates in these exhibits are based on Petitioner's self-reporting,

19     and these database documents were generated after the government

20     initiated removal proceedings against Petitioner.  Therefore, these

21     records are insufficient to controvert the evidence of Petitioner's

22     1976 birth year.[12]

23

24     _____

25     [12] Alternatively, these exhibits are inadmissible because Petitioner
       has failed to establish their authenticity.  The documents are not
26     self-authenticating, as they do not bear any official seals of the
       INS or official therein.  Fed. R. Evid. 902.  Nor did Petitioner
27     proffer extrinsic evidence of their authenticity in his pleadings or
       at the hearing.
28

**E.   Record of Deportable/Inadmissible Alien (Exhibit K)**

Exhibit K provides Form I-213, prepared in conjunction with Petitioner's criminal conviction, by the Department of Justice in 1998. (Dkt. 65, Ex. K).  The typewritten portion of the form indicates Petitioner's birthdate as "7/27/76;" however, "7/27/77 (?)" is hand written in the space adjacent.  (<u>Id.</u>).

Even if the Form I-213 were admissible, the Court is not persuaded that the handwritten notation, "7/27/77 (?)" implies that Petitioner was born in 1977.  Petitioner has provided no evidence indicating who made the notation, or the circumstances under which it was made. Rather, the handwritten notation suggests only what the Court already knows, namely that there exists arguably conflicting evidence regarding Petitioner's birthdate.  Merely pointing to this conflict, however, does not aid the Court in resolving it.  Therefore, this evidence is unhelpful and does not alter the Court's previous decision.

**F.   Affidavits of Family and Friends**

In its July 25, 2011 order, the Court invited Petitioner to submit "a memorandum with attached declarations that allow the Court to determine whether the [exhibits A through L] are admissible," and "if [they] are found admissible, why they should change the Court's earlier findings."  (Dkt. 68).

In response, Petitioner filed fifteen (15) affidavits from himself, family, and friends.  (Dkt. 69, Ex. A-O).  Certain of these affidavits complied with the Court's order by attempting to lay foundations with respect to Exhibits A through L, and these are incorporated in the Court's foregoing discussion.  (Dkt. 69, Ex. A, B,

F, M, N).[13]

However, the remaining affidavits comprise the testimony of Petitioner's relatives and friends attempting to show that Petitioner was born in 1977. (Dkt. 69, Ex. C, D, E, G, H, I, J, K, L). These affidavits are beyond the scope of this Court's limited remand because they do not shed any light on the admissibility or weight to be accorded to the "new" exhibits submitted by Petitioner. Nonetheless, in reviewing the affidavits, the Court concludes that even if they were considered, the affidavits have little persuasive value as they are biased and, at any rate, do not controvert the substantial documentary evidence pointing to Petitioner's 1976 birthdate. As such, they do not shift the preponderance of the evidence in Petitioner's favor.

**III. CONCLUSIONS OF LAW**

"Evidence of foreign birth . . . gives rise to a rebuttable presumption of alienage, and the burden then shifts to the petitioner to prove citizenship." Martinez-Madera v. Holder, 559 F.3d 937, 940 (9th Cir. 2009) (quoting Scales v. I.N.S., 232 F.3d 1159, 1163 (9th Cir. 2000)). It is undisputed that Petitioner was born in Armenia. Petitioner therefore bears the burden of proving that he is an American citizen. Lim v. Mitchell, 431 F.2d 197, 199 (9th Cir. 1970); see also Carrillo-Lozano v. Holder, No. CV-09-1948-PHX-NVW, 2010 WL 2292981, at *1 (D. Ariz. June 8, 2010) (same); Anderson v. Holder, No. CIV. 2:09-2519 WBS JFM, 2010 WL 1734979, at *3 (E.D. Cal. Apr. 27, 2010) (same).

---

[13] The Court recognizes that in determining Petitioner's true birth date, the Court could rely solely on the testimony of Susanna if it found her to be credible. However, in view of the Court's findings regarding the contrived origin of the 1997 Birth Certificate, these observations only serve to reinforce the Court's conclusion in its previous order that the mother's testimony is unreliable.

The parties, in their initial Joint Statement re: New Case Status Conference, agreed that Petitioner bears the burden of proving his citizenship. (Dkt. 8 at 2-3 ("The parties agree that Demirchyan must prove four essential facts in order to be eligible for derivative citizenship. . . . To date, the administrative and judicial proceedings have focused on the . . . requirement [that his mother was naturalized before he turned eighteen].")).

Based on the Court's findings of fact, the Court concludes as a matter of law that Petitioner has failed to meet his burden of proving by a preponderance of evidence that he is a United States citizen. Petitioner has failed to prove that he was born in 1977, and therefore that he was under the age of 18 at the time that his mother was naturalized in December 1994. The Court has concluded that the entirety of the admissible and credible evidence supports a finding that Petitioner was born in 1976. The only evidence to the contrary was either inadmissible as a matter of law or unreliable.

Accordingly, Petitioner is not entitled to citizenship under 8 U.S.C. § 1432(a) (West 1994).

**IV.   CONCLUSION**

For the foregoing reasons, the Court refrains from modifying its original conclusion: the Petition is DENIED. While the Court recognizes the severity of this result, Petitioner has failed to carry his burden to prove by a preponderance of the evidence that he was in fact born in 1977. There were simply too many questions and doubts surrounding the proffered exhibits for such evidence to outweigh the contrary evidence of a 1976 birth year. The Government shall file a proposed final judgment within five days, at which time the parties

shall have fourteen days to notify the Ninth Circuit per its Order

dated June 14, 2011.


          IT IS SO ORDERED.


DATED: March 28, 2013


                                STEPHEN V. WILSON

                                UNITED STATES DISTRICT JUDGE